## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| TELFAIR W. HOUSTON, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| IMPLUS FOOTCARE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT

Plaintiff Telfair Houston ("Houston" or "Plaintiff") hereby files its

Complaint against Implus Footcare and states as follows:

## INTRODUCTION

Telfair Houston invented a shoe insert that keeps a shoe from creasing, and

maintains the general shape and appearance of the upper section of the shoe. To

sell and market his invention, he entered into a contract with Implus, granting

Implus an exclusive license to make and sell the patented product. In the summer

of 2022, Implus stopped paying royalty payments to Houston, despite continuing to

make, market, and sell the product. Houston demanded Implus reinstitute his

royalty payments, but Implus refused. Houston therefore files this suit to prevent

Implus from stealing his product and to recover the amounts rightfully owed to

him.

## PARTIES

1.      Plaintiff Telfair Houston is a resident of Georgia and designed the patent for the subject product.

2.      Defendant Implus Footcare, LLC is a Delaware company, with its principal office in Durham, North Carolina.  Its registered agent office is 2626 Glenwood Avenue, Suite 550, Raleigh, North Carolina 27608.

## JURISDICTION and VENUE

3.      The subject contract contains a forum selection clause that states, "the federal or state courts situated in Fulton County, Georgia, United States of America, have exclusive jurisdiction over the resolution of all disputes that arise under this Agreement, and each party irrevocably submits to the personal jurisdiction of such courts."

4.      Federal Diversity Jurisdiction exists in this Court under 28 U.S.C. § 1332. Plaintiff is a citizen of Georgia. Defendant is a company organized in Delaware, with its principal place of business in North Carolina. Upon information and belief, no members of the LLC are citizens of Georgia. Accordingly, complete diversity exists between Plaintiff and Defendant.

5.      The amount in controversy also exceeds $75,000 exclusive of interest and costs.

6.    Houston and Implus entered into a contract, a copy of which is attached hereto as Exhibit "A." Under the contract, Houston was to receive minimum royalties of $150,000 in 2022 and $125,000 in both 2023 and 2024. Implus stopped paying royalties to Houston on or about the summer of 2022. Accordingly, the amount in controversy is satisfied.

## FACTS

7.    On November 22, 2019, Implus and Houston entered into an Exclusive License Agreement (the "contract"). This agreement controls Implus' sale of Houston's product.

8.    On page one of the contract, it states, "Licensor is the owner of U.S. Patent No. 8,490,300, 'Insert for Footwear' that issued on July 23, 2013." The contract further provides in section 11(a) that "[d]uring the term of this Agreement, Licensee will not directly or indirectly contest, challenge or deny the validity of any of the Protected Rights in any forum or for any purpose."[1]

9.    The Agreement grants Implus a license to market and sell Houston's product from December 1, 2019 to November 30, 2024. In exchange, Implus agreed to pay royalty payments to Houston. The contract automatically renews at the end of the contract term unless the contract is terminated as set forth in Section 6 of the contract.

---

[1] "Protected Rights" is defined in the contract as the patent for the shoe insert invented by Telfair Houston.

10.     Section 3 of the contract governs the royalties Implus is to pay to Houston, including minimum royalties for each Contract Year:

The amount of the royalty shall be equal to the greater of the Percentage Royalties… or Minimum Royalties… Percentage Royalties shall mean fifteen percent (15%) of the total Sales Price of Licensed Products sold by Licensee… Minimum Royalties shall mean the following amounts for the following periods: First Contract Year, $150,000; Second Contract Year, $150,000; Third Contract Year, $150,000; Fourth Contract Year, $125,000; Fifth Contract Year, $125,000.

11.     Under Section 3(B) of the Agreement, Implus is also required to submit to Houston a monthly report on the 15th of each month certifying the number of products sold, the price of the products, the dollar volume sale, all deductions, and the payment to be made to Houston.

12.     On or about June 2022, Implus, in violation of the contract, improperly notified Houston that it believed the Agreement had been invalidated due to the patent being unenforceable, and that it would no longer be making royalty payments. Implus then stopped making royalty payments to Houston.

13.     In addition to refusing to continue to make required royalty payments, Implus has also refused to continue providing monthly reports to Houston, so that Houston cannot know how much money Implus is making off his product – effectively stealing his invention and hiding the profits.

14.     On July 29, 2022, counsel for Plaintiff wrote to Implus notifying Implus that it is in default under the contract.

15.    On August 29, 2022, counsel for Implus responded to that letter and denied that it owes any money to Houston, doubling down on its claim that the patent is unenforceable and invalid.

16.    Even so, Houston cured the alleged deficiency claimed by Implus with the patent, and notified counsel for Implus of this action. Implus, however, continues to take the position that it does not have to pay royalties to Houston.

17.    Of significance, Implus, doing business under its sub-brand ForceField, has upon information and belief marketed the product using the patent number, which it has alleged is invalid. Implus has also, upon information and belief, wrongfully used Houston's name and likeness to market the product.

18.    Since refusing to continue to pay royalties to Houston, Implus has, upon information and belief, sold and shipped the product in a box that reads:

> Inventor of ForceField Shoe Crease Preventers, T.W. Houston grew up on the streets of Boston – a place where shoes are more than functional, each style reflects a sense of pride and the strength of your community.

19.    Houston has been damaged as a result of Implus' actions and has therefore been forced to file this lawsuit.

## COUNTS

### COUNT I
### BREACH OF CONTRACT

20.    Plaintiff hereby incorporates the preceding paragraphs by reference as if set forth in full herein.

5

21.    Houston entered into a valid contract with Implus.

22.    Houston fully performed under the contract.

23.    Implus materially breached the contract by refusing to make royalty payments to Houston.

24.    Implus further materially breached the contract when it refused to stop providing monthly accounting reports to Houston as required by the Agreement.

25.    Implus also breached section 11(a) of the contract by taking the position that the patent is unenforceable and refusing to pay royalties to Houston for this reason.

26.    Implus additionally had an obligation under section 13 of the contract to, in good faith, use its commercially reasonable best efforts to market, advertise, promote, and sell the product on Houston's behalf. Implus has failed to do so, by, *inter alia,* keeping profits for itself and refusing to make required royalty payments to Houston and provide monthly accounting reports to Houston.

27.    Implus' acts or omissions are inconsistent with the contract's purpose and have deprived Houston of his contemplated benefit of the contract.

28.    Implus has failed to cooperate and has hindered the performance of Houston. Implus has not acted in good faith, and has intentionally, deliberately, or willfully frustrated Houston's performance or expected benefit under the

contract. Thus, Implus' conduct also constitutes a breach of the duty of good faith and fair dealing.

29.    Implus breached the duty of good faith and fair dealing under the contract, including under sections 3, 4, 11(a), and 13 of the contract.

30.    Plaintiff has suffered damages as a result of Defendant's breaches of contract and duty of good faith and fair dealing in an amount no less than $400,000.00 in unpaid minimum royalties, as well as consequential damages, loss of business, any amounts for which Houston seeks indemnification under the contract, and other damages set forth herein. Implus should also be required to provide all back monthly reports since the summer of 2022 that it has not provided to Houston.

## COUNT II
## PROMISSORY ESTOPPEL
### (In the Alternative)

31.    Houston hereby incorporates the preceding paragraphs by reference as if set forth in full herein.

32.    In return for Houston allowing Implus to make, market, and sell his product, Implus promised to make royalty payments to Houston.

33.    Implus should have expected Houston to rely on Implus' promise, and Houston did in fact rely on Implus' promise.

34.    Houston was induced to act based on the promise from Implus.

35.    In justifiably relying on Implus' promise to make royalty payments to him and provide him with monthly reports, Houston forwent profits he otherwise would have realized from sales of the product he could have made with another entity.

36.    Having accepted the benefit of Houston's reliance upon Implus's promise, and if for any reason the contract is deemed unenforceable, Implus is now estopped from denying Houston the benefit of his bargain.

37.    Implus' failure to honor its promise to Houston has damaged Houston by depriving Houston of profits he would have realized by selling the product on his own or through another entity.

38.    Thus, injustice can be avoided only by enforcement of the promise and payment of royalties to Houston, along with the issuance of appropriate monthly accounting reports owed to him.

## COUNT III
## UNJUST ENRICHMENT
### (In the Alternative)

39.    Plaintiff hereby incorporates the preceding paragraphs by reference as if set forth in full herein.

40.    In the event it is determined that the contract is somehow unenforceable, Implus has nevertheless been unjustly enriched.

41.    Plaintiff provided a valuable service to Defendant by licensing his patented product to Defendant, and granting Defendant the sole right to make, market, and sell the product.

42.    Houston agreed to forgo profits it would have realized by making and selling the product on his own or through other entities.

43.    Implus induced, accepted, or otherwise encouraged Houston to allow it to manufacture, market, and sell his valuable product.

44.    Implus is attempting to avoid payment for the value it has received from the product.

45.    Implus knew of the value being bestowed upon it by Houston and failed to stop the act or to reject the benefit.

46.    Defendant's receipt of all the benefits from the product without compensating Houston would be unjust.

47.    Plaintiff is therefore entitled to damages in an amount to be determined at trial.

## COUNT IV
## INVASION OF PRIVACY
## APPROPRIATION OF LIKENESS

48.    Plaintiff hereby incorporates the preceding paragraphs by reference as if set forth in full herein.

49.     Since Defendant stopped all performance under the Agreement, it has appropriated Plaintiff's name and likeness for its packaging and marketing of ForceField Shoe Crease Preventer.

50.     Defendant has improperly and wrongfully used Plaintiff's name and likeness for its benefit, use, advantage, or commercial gain.

51.     The use of Plaintiff's image and likeness added value to defendant's commercial efforts that otherwise would not have existed.

52.     Plaintiff has suffered harm and damages as a result of Defendant's actions.

53.     Plaintiff is therefore entitled to damages in an amount to be determined at trial.

## COUNT V
## ACCOUNTING

54.     Plaintiff hereby incorporates the preceding paragraphs by reference as if set forth in full herein.

55.     In breaching the contract, or in the alternative, by breaking its promise to pay royalties to Houston, Implus has damaged Houston by depriving him of profits he would have realized from the sale of his product since the summer of 2022.

56.     Further, in accepting Houston's offer to allow it to make, market, and sell the product, but by refusing to honor its promise to pay royalties to Houston,

thereby depriving Houston of the benefit of his bargain, Implus has been unjustly enriched by retaining profits from the sales of the product since the summer of 2022.

57.    The contract provides that for four years after the end of each contract year, Implus shall keep and maintain accurate and complete records for such contract year of its purchase, marketing, and sale of Licensed Products to verify the accuracy of reports and payments required to be made under the Agreement.

58.    As a result of Implus' actions, Houston is entitled to an accounting of Implus' books and records sufficient to (a) show the profits Implus realized from sales of the product from the summer of 2022 through the present, and (b) to allow Houston to accurately estimate the monthly and annual profits Implus realized from sales of the product.

## COUNT VI
## PUNITIVE DAMAGES

59.    Plaintiff hereby incorporates the preceding paragraphs by reference as if set forth in full herein.

60.    Defendant's actions showed willful misconduct, fraud, wantonness, or that entire want of care that gives rise to the presumption of conscious indifference to the consequences.

61.    Because Defendant acted with specific intent to cause harm to the Plaintiff, there is no limit to the amount of punitive damages for which Defendant is liable.

62.    Pursuant to OCGA §§ 51-12-5.1(d)(1) and 51-12-5.1(f), Houston prays for an award of punitive damages to punish Implus and deter it from engaging in the same or similar misconduct in the future.

## COUNT VII
## ATTORNEYS' FEES, COSTS, AND EXPENSES

63.    Plaintiff hereby incorporates the preceding paragraphs by reference as if set forth in full herein.

64.    Plaintiff is owed his attorney's fees, costs, and expenses due to the Defendant's breach of contract and other wrongful actions of Houston.

65.    Houston is entitled to his reasonable fees, costs, and expenses incurred pursuant to Section 10(A) of the contract, a copy of which is attached hereto.

66.    Additionally, the Defendant has been stubbornly litigious, acted in bad faith, and has caused Plaintiff unnecessary delay and expense.

67.    Houston is therefore also entitled to recover all reasonable fees, costs, and expenses under O.C.G.A. § 13-6-11.

WHEREFORE, Houston prays for the following relief:

a) For a trial by jury,

b) That judgment be rendered in his favor on all counts;

c) That he be awarded all actual, incidental, consequential, and punitive damages in an amount to be proven at trial for the counts asserted herein;

d) That Implus be required to provide all monthly reports to Houston from the summer of 2022 through present;

e) A full accounting of Implus' books and records from November 2019 through the present;

f) That he recover all expenses of this litigation, including reasonable attorneys' fees;

g) Award Houston such other and further relief as may be just and proper.

## Plaintiff Demands a Trial by Jury

Respectfully Submitted, this 31st day of May, 2024

POOLE HUFFMAN, LLC

*/s/ W. Drake Blackmon*
Jon David Huffman
Georgia Bar No. 937966
W. Drake Blackmon
Georgia Bar No. 375337
3562 Habersham at Northlake
Building J, Suite 200
Tucker, GA 30084
(404) 373-4008
Facsimile: 888-709-5723
jondavid@poolehuffman.com
drake@poolehuffman.com

*Attorneys for the Plaintiff*

13

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), the undersigned counsel hereby certifies that the foregoing document has been prepared in Times New Roman 14 point, one of the fonts approved by LR 5.1(B).

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TELFAIR W. HOUSTON,                    )
                                       )        CIVIL ACTION FILE NO.
      Plaintiff,                       )
                                       )        _____
v.                                     )
                                       )
IMPLUS FOOTCARE, LLC,                  )
                                       )
      Defendant.                       )

## DECLARATION OF TELFAIR HOUSTON FOR VERIFIED COMPLAINT

I, Telfair Houston, declare as follows:

1.     I am a resident of Georgia.

2.     If called to testify, I would testify competently as to the matters set forth in the Verified Complaint in this action.

3.     I verify under penalty of perjury that the factual statements contained in the Verified Complaint are true and correct to the best of my knowledge and understanding.

This the 29th day of May, 2024.

_____
Telfair Houston

**Implus Footcare, LLC**

**Exclusive License Agreement**

THIS EXCLUSIVE LICENSE AGREEMENT ("Agreement") is made and entered into as of this 22nd day of November, 2019, by and between TELFAIR W. HOUSTON III, an individual (doing business as NuSol Innovations) (hereinafter referred to as "Licensor"), having his principal place of business at 1238 Ladd St., Atlanta, GA 30310, and IMPLUS FOOTCARE, LLC (hereinafter referred to as "Licensee"), a Delaware limited liability company having its principal place of business at 2001 T.W. Alexander Drive, Box 13925, Durham, North Carolina 27709-3925.

WITNESSETH THAT

Licensor is the owner of U.S. Patent No. 8,490,300, "Insert for Footwear" that issued on July 23, 2013, and is referred to by Licensor as the "De-Creaser" patent (hereinafter referred to as "Protected Rights").

Licensee is in the business of making and selling shoe care products in the United States, Australia, Canada, and throughout the world (the "Territory") and is the owner of certain technology and or know-how pertaining to developing, manufacturing and selling a shoe crease preventer that is covered by or within the scope of the Protected Rights (as described or claimed in Exhibit A hereto).

Licensor and Penguin Brands, Inc. ("Penguin") entered into an Exclusive License Agreement, dated June 22, 2006 (the "Prior License Agreement"), that secured and documented an exclusive license under the Protected Rights granted to Penguin for a term of three years, continuing through November 30, 2009.

Licensor and Penguin entered into an Exclusive License Agreement, dated July 15, 2009 (the "Second Prior License Agreement"), that secured and documented an exclusive license under the Protected Rights granted to Penguin for a term, including renewal terms, continuing through November 30, 2019.

Licensee acquired certain assets of Penguin pursuant to an Asset Purchase Agreement dated June 14, 2013, and Licensor consented to the assignment of the Second Prior License Agreement to Licensee in a written consent effective June 15, 2013.

Licensor and Licensee now desire to enter into a new exclusive license agreement that will grant Licensee certain rights under the Protected Rights for the term set forth herein.

In consideration of the premises and of mutual covenants set forth herein, it is agreed by and between the parties as follows:

1.    **DEFINITIONS:**

For purposes of the present Agreement, the following terms shall have the meanings indicated:

A.    "Contract Year":  The First Contract Year shall commence on December 1, 2019 and end on November 30, 2024.  Each subsequent Contract Year shall begin on the anniversary of the prior Contract Year.

B.    "Licensed Products" shall mean any goods, materials, and products covered by or within the scope of the Protected Rights.

**EXHIBIT**

**A**

C.      "Protected Rights" shall mean those intellectual property rights listed herein above (and in Exhibit A and Exhibit B hereto).

D.      "Sale" shall mean any sale, gift, delivery, lease, or consignment, as the case may be, whether for domestic use or export, and goods subject to royalty shall be considered "sold" when shipped, delivered, invoiced, or paid for, whichever shall occur first.

E.      "Sales Price" shall mean the price invoiced in the regular course of business in a genuine arm's length transaction and shall include a corresponding lease, rental, or consigned price.

2.      **LICENSE GRANT:**

A.      Licensor hereby grants to Licensee, on the terms and conditions set forth in this Agreement, a personal, indivisible, non-transferable, exclusive license under the Protected Rights to make, use, export, import, offer to sell, and sell Licensed Products within the Territory, with no right to sublicense without the prior written consent of Licensor (except that Licensee may have Licensed Products made for it by third parties).

B.      The exclusive license shall be for all sales of Licensed Products covered by or within the scope of the Protected Rights, as described in Exhibit A hereto.

C.      The license shall be effective as of December 1, 2019 ("Effective Date"), and shall continue for the duration of this Agreement.

D.      Nothing contained in this Agreement shall be construed as conferring, by implication, estoppel or otherwise, any license or right under any Protected Rights, or any other patent or patent right, except for the license under the Protected Rights granted herein.

E.      From the Effective Date of this Agreement and until its termination in accordance with the terms hereof, Licensor will not make, have made by others, use, have used by others, import, have imported by others, sell, have sold by others, offer for sale, have offered for sale by others, display or have displayed by others, Licensed Products, nor will Licensor authorize others to perform any of such acts.

F.      The parties acknowledge and agree that Licensee shall be free to charge such prices for Licensed Products as Licensee may determine to be appropriate, in Licensee's sole discretion.

3.      **ROYALTIES: COMPENSATION:**

A.      Licensee shall pay royalties to Licensor on all Licensed Products sold by and for Licensee. The amount of the royalty shall be equal to the greater of Percentage Royalties (as hereinafter defined) or Minimum Royalties (as hereinafter defined), in each case, less: (i) returns and credits, (ii) cash and trade discounts given to customers, (iii) allowances given to customers for damaged, late or defective merchandise, (iv) shipping and freight charges actually billed to customers (to the extent included of gross sales), and (v) sales, use, and excise taxes (to the extent included in gross sales).

(a)      As used in this Agreement, the term Percentage Royalties shall mean fifteen percent (15%) of the total Sales Price of Licensed Products sold by Licensee. If the 20.3% tariff on the Licensed Products is eliminated (tariff takes effect in December 2019), then the Percentage Royalties shall increase as follows:

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

if the number of units of Licensed Products sold in the Third Contract Year has increased by 25% over the number of units of Licensed Product sold in the First Contract Year, then the Percentage Royalties shall increase to eighteen percent (18%) for the Fourth and Fifth Contract Year.

(b)     As used in this Agreement, the term <u>Minimum Royalties</u> shall mean the following amounts for the following periods:

| Contract Year | Amount |
| --- | --- |
| First Contract Year | $150,000 |
| Second Contract Year | $150,000 |
| Third Contract Year | $150,000 |
| Fourth Contract Year | $ 125,000 |
| Fifth Contract Year | $ 125,000 |

B.     On the 15th day of the month following the end of each calendar month during the term of this Agreement, Licensee shall submit to Licensor a report ("Monthly Report") certifying the following:  (i) the total number of Licensed Products subject to royalty sold during the previous calendar month, (ii) the Sales Price or Prices of such products, (iii) the aggregate dollar volume of Sales for such period, (iv) all deductions therefrom permitted by this Agreement, and (v) the payment to be made thereon under Paragraph 3(A) hereof. The Monthly Report due on the 15th shall be accompanied by the monthly payment of Percentage Royalties due for that given period. Upon request of Licensor, Licensee shall provide a quarterly report that shows its total current inventory of Licensed Products on hand.

C.     A similar report containing the same information as the Monthly Report shall be made within thirty (30) days after the expiration or termination of this Agreement, covering the period from the end of the last calendar month reported until such date of expiration or termination.

D.     Licensee shall be entitled to a credit against Minimum Royalties owed under Paragraph 3(A) for all Percentage Royalties paid under Paragraph 3(A).  Within thirty (30) days following the end of each Contract Year during the term of this Agreement, Licensee shall submit to Licensor a report ("Annual Report") certifying the following: (i) the total Percentage Royalties paid to Licensor with respect to such Contract Year, and (ii) the difference between such total and the Minimum Royalties owed to Licensor with respect to such Contract Year.  Each Annual Report shall be accompanied by the payment of all Minimum Royalties owed to Licensor with respect to the prior Contract Year, if any, which payment shall be equal to the difference between the Minimum Royalties applicable to such Contract Year, as set forth in Paragraph 3(A)(b) above, and the aggregate Percentage Royalties previously paid by Licensee with respect to such Contract Year.

E.     A non-refundable, one time, upfront fee of One Hundred Fifty Thousand Dollars ($150,000.00) (the "<u>Upfront Fee</u>") shall be paid by Licensee to Licensor within ten (10) business days after Licensee's receipt of a fully signed copy of this Agreement.  The Upfront Fee shall not be credited against future royalty payments.

F.     Licensor may make an advance request for the payment of any single month's Percentage Royalties or Minimum Royalties, up to $10,000 ("<u>Advance Royalty</u>"), provided that such request is made within the first eight (8) days of the month.  Licensor may not request an Advance Royalty more than two (2) times in any Contract Year. Licensee shall pay the Advance Royalty within five (5) business days of Licensor's request, and the payment of the Advance Royalty shall be a credited against the Percentage Royalties or Minimum Royalties due for said month.

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

G.      At the end of each Contract Year during the term of this Agreement, if the number of units of Licensed Products sold in such Contract Year has increased by seven percent (7%) over the units sold in the immediately prior Contract Year, then Licensee shall pay to Licensor the sum of Twenty-Five Thousand Dollars ($25,000), and if the number of units of Licensed Products sold in such Contract Year has increased by fifteen percent (15%) over the units sold in the immediately prior Contract Year, then Licensee shall pay to Licensor the additional sum of Twenty-Five Thousand Dollars ($25,000) (each, a "Bonus"). Payment of any Bonus owed to Licensor shall be made within thirty (30) days following the end of each Contract Year during the term of this Agreement.

4.      **RECORDKEEPING:**

For four (4) years after the end of each Contract Year, Licensee shall keep and maintain accurate and complete records for such Contract Year of its purchase, marketing, and sale of Licensed Products subject to royalty sufficient to verify the accuracy of the reports and payments required to be made by it under this Agreement. Licensee's records shall be ready and available during normal business hours and upon at least twenty (20) days prior written notice, for authorized, verified employee(s) or representative(s) of Licensor for the purpose of verifying Licensee's compliance with all conditions and obligations of this Agreement. Any such employees or representatives shall be required to enter into non-disclosure agreements with Licensee on terms reasonably acceptable to Licensee.

5.      **PATENT MARKINGS; PACKAGING:**

A.      During the term of the license granted by this Agreement, Licensee agrees to have all Licensed Products manufactured and sold by it marked permanently and legibly with the number of the patent included in the Protected Rights, or marked in any other manner that complies with 35 U.S.C. § 287, and in a form subject to the prior written approval of Licensor, such approval not to be unreasonably withheld, delayed or conditioned.  Such marking shall take a form such as: *"Patent No. 8,490,300, NuSol Innovations."*

B.      During the term of the license granted by this Agreement, Licensee shall be required to submit to Licensor, at no cost or expense to Licensor, for Licensor's inspection and written approval, representative samples of all boxes, bags and packaging in which the Licensed Products are proposed to be sold to consumers (collectively, "Packaging") at least thirty (30) days prior to any trade or public use thereof.  If, within ten (10) days of Licensor's receipt of such a sample, Licensor notifies Licensee in writing that it disapproves of such sample, then Licensee shall not use the Packaging represented by the sample.  If Licensor disapproves any particular Packaging in writing, then Licensee will modify it and resubmit it to Licensor for its written approval.  Samples that are not disapproved in writing within ten (10) days after their receipt by Licensor shall be deemed approved. Any Packaging used by Licensee prior to the Effective Date is approved and Licensee is not required to re-submit such Packaging for approval.

C.      Intentionally Omitted.

D.      Intentionally Omitted.

6.      **TERM AND TERMINATION OF AGREEMENT:**

A.      The initial term of this Agreement shall commence on December 1, 2019 and shall continue until the last day of the Fifth Contract Year (the "Initial Term").  At the end of the Initial Term, this Agreement

-4-

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

will be automatically renewed for an additional term of five (5) years (the "Renewal Term") unless either: (i) Licensee notifies Licensor in writing (the "Termination Notice"), not less than three (3) months prior to the end of the Initial Term, of its decision to terminate this Agreement at the end of the Initial Term; or (ii) this Agreement was previously terminated pursuant to this Paragraph 6. The Renewal Term shall be on the same terms and conditions as the Initial Term, provided however, that the Percentage Royalties shall be eighteen (18%) percent for the Renewal Term, and Minimum Royalties for each Contract Year shall increase by 25% for the Renewal Term. Notwithstanding the foregoing, in no event will Licensor have any obligation to accept the renewal of this Agreement if Licensee is then in default of any of its obligations under this Agreement (unless such default is cured as provided herein).

B.      If: (i) Licensee should fail to or refuse to submit any report required to be submitted or make any payment required to be made under Paragraph 3 of this Agreement, and fail to cure such failure or refusal within thirty (30) days after receipt of written notice thereof from Licensor, specifying such failure or refusal with particularity, or (ii) Licensee should be in breach or default of any other provision of this Agreement, including Paragraph 5 of this Agreement, and fail to cure such breach or default within thirty (30) days after receipt of written notice thereof from Licensor, specifying such failure, refusal, breach or default with particularity, or (iii) Licensee should initiate any proceeding for dissolution or winding up its business, or (iv) Licensee should apply directly or indirectly for relief under any law relating to bankruptcy or insolvency, or (v) Licensee should become the subject of any proceeding directly or indirectly relating to bankruptcy (which proceeding is not dismissed within sixty (60) days after the date of filing thereof), then, in any such event, Licensor, in addition to all other remedies available to it, shall have the right, by written notice to Licensee, to terminate this Agreement forthwith, in accordance with the Notice section of this Agreement, with an electronic email confirming the sending of said notice to terminate.

C.      If: (i) Licensor should be in breach or default of any provision of this Agreement, and fail to cure such breach or default within thirty (30) days after receipt of written notice thereof from Licensee, specifying such failure, refusal, breach or default with particularity, or (ii) Licensee becomes unable to make, use and/or sell any Licensed Product due to changes or modifications in the Protected Rights, and/or Licensee's rights under this Agreement are invalidated or modified in any material respect, as a result of a judgment or decree in or settlement of a legal action brought by or involving a third party, or (iii) any United States patent issued by the United States Patent and Trademark Office with respect to the Protected Rights is cancelled or abandoned because of Licensor's failure to make any payment of maintenance fees or otherwise, then, in any such event, Licensee, in addition to all other remedies available to it, shall have the right, by written notice to Licensor, to terminate this Agreement forthwith, in accordance with the Notice section of this Agreement, with an electronic email confirming the sending of said notice to terminate. Licensor's delay or failure to pay maintenance fees to the United States Patent and Trademark Office alone (without cancellation or abandonment of the patent) shall not be grounds for termination of this Agreement by Licensee.

D.      Notwithstanding the foregoing: (i) if Licensee breaches or defaults under the same monetary provision of this Agreement on three (3) separate occasions during either the Initial Term or the Renewal Term of this Agreement, or (ii) if either party breaches or defaults under the same nonmonetary provision of this Agreement on three (3) separate occasions during either the Initial Term or the Renewal Term of this Agreement, then, in any such event, the next time the same provision is breached, the non-breaching party shall have the right by written notice to the breaching party to immediately terminate this Agreement if it fails to cure such breach within five (5) days after receipt of such notice, after which the breaching party shall have no further right to remedy such breach. PROVIDED, an error in accounting for and payment of royalties on sales shall not be considered to be a breach giving rise to termination if:

-5-

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

(a) said error does not result in underpayment by at least five percent (5%) during a quarter; (b) Licensee demonstrates that said error was inadvertent and not the result of gross negligence; and (c) said error is remedied within the cure period provided above.

E.      Upon termination of this Agreement under Paragraphs 6(B), 6(C)(i), 6(C)(ii), or 6(D) above, Licensee shall immediately take all commercially reasonable steps to cease production, importation and sale of Licensed Products. Notwithstanding the foregoing, following any expiration or termination of this Agreement, Licensee shall be entitled, for an additional period of six (6) months only ("the "Sell-Off Period"), on a non-exclusive basis, to sell and dispose of any Licensed Products then on hand or in process, provided that at the time of termination or expiration the quantity of Licensed Products to be sold is reasonable under the circumstances taking into account the quantity of similar Licensed Products available for sale at the same time in the prior Contract Year and any reasonable increase in sales of Licensed Products projected prior to termination or expiration of the License Agreement. Further, Licensee shall use commercially reasonable efforts to achieve the maximum Sales Price for Licensed Products sold during the Sell-Off Period. Such sales shall be subject to all of the terms of this Agreement and subject to an accounting for and the payment of royalties thereon. Such accounting and payment shall be due within thirty (30) days after the close of the Sell-Off Period.

F.      Upon the expiration or termination of this Agreement for any reason, all rights and licenses granted hereunder to Licensee to sell and market Licensed Products shall terminate. Licensee shall cooperate with and provide reasonable assistance to Licensor in retrieving the molds used to make the Licensed Products, at Licensor's expense, which expenses can be deducted from any monies due Licensor at the expiration or termination of this Agreement.

G.      The expiration or termination of this Agreement shall not relieve either party of its obligations under this Agreement, including without limitation Licensee's obligation to make a final statement and report, or its liability for the payment of royalties on Licensed Products sold prior to the date of such expiration or termination or during the Sell-Off Period, nor shall any such expiration or termination prejudice any remedy, cause of action, or claim of either party accrued or to accrue or which such party may have on account of any failure, default, breach, or refusal by the other party hereto. Notwithstanding any provision of this Agreement to the contrary, Paragraphs 8, 10, 11, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 27, and 28 hereof shall survive any expiration or termination of this Agreement.

H.      If this Agreement is terminated for any Licensee default, then Licensee shall pay to Licensor as liquidated damages, in addition to any fees due under Section 6(G), the total Minimum Royalties owed for the next twelve (12) months of the Initial Term or any Renewal Term, or if the default occurs in the last Contract Year of the term, then any unpaid Minimum Royalties owed for the last Contract Year.

7.      **INTENTIONALLY OMITTED.**

Intentionally Omitted.

8.      **RIGHT OF FIRST REFUSAL:**

A.      If the parties opt not to renew this Agreement, as provided in Paragraph 6 above, and, during the last year of the Renewal Term or within six (6) months after any expiration of this Agreement (the "First Refusal Period"), Licensor obtains a bona fide written offer from a third party (that is not related to or affiliated with Licensor) which Licensor desires to accept (the "Offer") to license the Protected Rights in connection with the marketing, distribution and/or sale of Licensed Products, then Licensor will deliver a

-6-

copy of such Offer to Licensee. The Offer will set forth its date, the length of the term, the amount of any Minimum Royalties, the rate of any Percentage Royalties, the degree of exclusivity, and the other terms and conditions upon which the license is to be granted, as well as the name and address of the prospective licensee or licensees. Licensor will deliver a copy of the Offer to Licensee within seven (7) business days after its receipt of the Offer.

B.       Transmittal of the Offer to Licensee by Licensor will constitute an offer by Licensor to enter into a license agreement with Licensee on the terms set forth in the Offer. For a period of thirty (30) days after Licensee's receipt of the Offer (the "Offer Period"), Licensee will have the option, exercisable by written notice to Licensor, to accept Licensor's offer to enter into a license agreement with Licensee on the terms set forth in the Offer.

C.       If, at the end of such Offer Period, Licensee has accepted the Offer, then the parties will enter into such a license agreement within ten (10) days thereafter.

D.       If, at the end of such Offer Period, Licensee has not accepted the Offer, then Licensor will have the absolute right to enter into a license agreement with the prospective licensee on the terms and conditions set forth in the Offer; provided, however, that no such license agreement may take effect prior to the expiration or termination of the term of this Agreement.

9.       **LICENSE NOT TRANSFERABLE:**

This license is non-transferable, and Licensee has not been granted any permission for sublicense, unless given written consent by Licensor (except that Licensee may have Licensed Products made for it by third parties). If Licensee desires to sublicense any of the rights granted herein, it shall submit a written request therefor to Licensor for its approval, such approval not to be unreasonably withheld, delayed or conditioned; provided, however, that no such sublicense shall relieve Licensee of any obligation, financial or otherwise, under this Agreement.

10.      **INDEMNIFICATION AND INSURANCE:**

A.       Licensee agrees to indemnify and hold Licensor, its directors, officers, employees and agents, harmless against any and all liabilities, actions, damages, claims, expenses (including, but not limited to, reasonable attorneys' fees), costs, charges, taxes and the like arising out of or relating to Licensee's operations under this Agreement, and/or Licensee's manufacture or sale of Licensed Products. Notwithstanding the foregoing, in no event shall Licensee have any obligation under this Paragraph 10(A) with respect to any claim covered by Paragraph 10(B) below.

B.       Licensor agrees to indemnify and hold Licensee, its directors, officers, employees and agents, harmless against any and all liabilities, actions, damages, claims, expenses (including, but not limited to, reasonable attorneys' fees), costs, charges, taxes and the like arising out of or relating to: (i) any acts of gross negligence or willful misconduct by Licensor or its directors, officers, employees and/or agents, and (ii) subject to Paragraph 10(F) below, any claim that any Licensed Products produced under the Protected Rights infringe upon or violate any patent, copyright, trade secret, trademark or other proprietary right of any third party. Notwithstanding the foregoing, in no event shall Licensor have any obligation under Paragraph 10(B)(ii) with respect to any claim relating to the method or process of manufacturing, distributing or selling any Licensed Products or any claim relating to any changes made by Licensee to any Licensed Products which are not covered by or within the scope of the Protected Rights.

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

C.     If a party entitled to indemnification under Paragraph 10(A) or 10(B) above (the "Indemnified Party") receives notice of any event that might give rise to a claim for indemnity under either Paragraph 10(A) or 10(B), then the Indemnified Party shall give written notice thereof to the party from whom indemnity would be sought (the "Indemnifying Party").  The Indemnified Party shall permit the Indemnifying Party, at its sole option and expense, to assume the defense of any such claim by counsel reasonably satisfactory to the Indemnified Party and to settle or otherwise dispose of the same; provided, however, that the Indemnified Party shall cooperate with the Indemnifying Party and may at all times participate in such defense, at its own expense and through counsel of its own choosing (except to the extent that it is entitled to indemnity therefor); and, provided, further, that the Indemnifying Party shall not, in defense of any such claim, except with the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, delayed or conditioned), consent to the entry of any judgment or enter into any settlement that does not include the giving by the claimant or plaintiff in question to the Indemnified Party a release of all liabilities in respect of such claim, or that does not result only in the payment of money damages by the Indemnifying Party.

D.     During the term of this Agreement, Licensee shall procure and maintain comprehensive general liability insurance, naming Licensor as an additional insured, in an amount greater than or equal to $2,000,000 per incident, including:

(i)     Product liability;
(ii)    Personal Liability;
(iii)   Personal Injury; and
(iv)    Property Damage.

E.     Upon the reasonable request of Licensor, Licensee shall provide Licensor with written evidence of the above insurance.

F.     Notwithstanding any other provision of this Agreement to the contrary, in no event shall Licensor's aggregate liability for a claim under Paragraph 10(B)(ii) above be greater than the aggregate royalties paid to Licensor by Licensee under this Agreement during the eighteen (18) month period immediately prior to the occurrence of the event that gave rise to the claim in question.

11.    **INTELLECTUAL PROPERTY:**

A.     During the term of this Agreement, Licensee will not directly or indirectly contest, challenge or deny the validity of any of the Protected Rights in any forum or for any purpose.

B.     Licensee agrees that all modifications, developments, innovations and changes to the Licensed Product covered by or within the scope of the Protected Rights are and shall remain the property of Licensor during and after this Agreement has expired or terminated or renewed.

C.     Any and all intellectual property rights resulting from any improvements made by Licensee during the term of this Agreement and covered by or within the scope of the Protected Rights shall be the sole property of Licensor ("Improvements").

D.     If Licensee desires to improve, modify or change the design of the Licensed Products, it shall notify Licensor in writing as soon as reasonably practicable after conception, or at least thirty (30) days prior to the implementation of any such Improvement, modification or change.  In no event may any such

-8-

Improvement, modification or change be made until such Improvement, modification or change has been approved by Licensor, such approval not to be unreasonably withheld, delayed or conditioned.

E.      All Improvements will be filed with the Protected Rights under this Agreement by Licensor, in its sole discretion, at Licensor's sole cost and expense. As soon as reasonably practicable after Licensee's receipt of a request from Licensor, Licensee, its employees and agents will make readily available to Licensor all designs, applications, and drawings pertaining to any enhancement, modification, or change made to originals submitted to Licensee by Licensor. Licensor will reimburse Licensee the reasonable cost, if any, of fulfilling any such requests within thirty (30) days of License's invoice therefor.

F.      Licensor hereby represents and warrants to Licensee that: (i) Licensor is the sole owner of the Protected Rights, (ii) Licensor has no knowledge of any act or instance of infringement of the Protected Rights, (iii) Licensor has not granted a license to any other party to use any of the Protected Rights, (iv) Licensor will not grant any other license to use any of the Protected Rights during the term of this Agreement, (v) there are no pending or threatened suits, legal proceedings, claims or governmental investigations with respect to any of the Protected Rights, and (vi) Licensor has not received notice of any claim alleging that the Protected Rights infringe or violate any third party's patents, copyrights, trade secrets, trademarks or other proprietary rights.

G.      [Intentionally Omitted.]

H.      From and after the execution of this Agreement, Licensor shall promptly furnish to Licensee true and complete copies of all correspondence, notices, pleadings and other documents and papers received by it in connection with any infringement or alleged infringement of any patent issued under the Protected Rights. Before responding to any such correspondence, notice, pleading or other documents or papers, Licensor shall consult with Licensee concerning Licensor's response thereto, and shall seek in good faith to incorporate Licensee's views timely submitted to Licensor in its response, except and only to the extent that they may differ from Licensor's reasonably held views, in which event Licensor's obligation shall be to consider Licensee's views in good faith and to make a reasonable decision based thereon.

12.  **INFRINGEMENT BY OTHERS:**

A.      If either party has reason to believe that any person may be infringing any of the Protected Rights, such party will promptly notify the other party by providing all information in its possession, custody or control to permit the other party to determine whether such infringement is occurring.

B.      Licensee may, in its sole discretion, enforce the Protected Rights in its own name, through legal action or otherwise, and may, if required to establish standing to sue, join Licensor in any such action. Licensor will cooperate with Licensee in its enforcement efforts. Licensee will have the right to select legal counsel, reasonably satisfactory to Licensor, to represent itself and Licensor (if joined, at Licensee's request) and shall pay all legal fees and costs of enforcement, and after reimbursement of such legal fees and costs, any remaining recovery shall be shared equally by Licensor and Licensee. Notwithstanding the foregoing, Licensor shall have the right at its own expense to select its own legal counsel to represent itself and to defend against any claim of patent invalidity or unenforceability.

13.  **MARKETING AND ADVERTISING:**

A.      During each Contract Year, Licensee's spending budget for marketing and advertising in support of

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

the Licensed Products shall meet or exceed one and seven tenths percent (1.7%) of the total Sales Price of Licensed Products sold by Licensee during that Contract Year. Marketing and advertising expenses shall include, without limitation, "slotting fees" paid to third parties, costs and expenses attributable to trade shows, catalogs and websites, advertising agency and public relations costs, fees and expenses, point-of-sale advertising featuring the Licensed Products, the value of and productions costs associated with trade and/or roto advertising expended by Licensee featuring the Licensed Products, retailer incentives, athlete sponsorship and/or endorsement costs and expenses (including both compensation and product provided to spokespersons), costs associated with the production of sales materials, costs, fees and expenses related to event sponsorship (including the cost of travel to and from events), store fixtures that are designated for the Licensed Products, co-op dollars spent to the extent relating to the Licensed Products, the cost of any products provided to Licensor, and product mark-downs. Licensee shall provide written documentation to Licensor within sixty (60) days of the end of each Contract Year verifying expenditures for that year's marketing and advertising budget.

B.    During the term of this Agreement, Licensee has the obligation to, in good faith, use its commercially reasonable best efforts to market, advertise, promote, and sell the Licensed Products within the Territory so as: to maintain and enhance the value of the goodwill residing in the Protected Rights and the Licensed Products; to produce the maximum royalties consistent with the quality standards established by the Licensor; and to exploit the Territory in marketing the Licensed Products. Upon request of Licensor, at least once in each calendar quarter, Licensee's brand manager and/or marketing personnel responsible for the Forcefield brand shall schedule a meeting (at Licensee's corporate headquarters in Durham, NC or Carlsbad, CA, as mutually agreed-upon by the parties) or conference call with Licensor to discuss new opportunities and ideas to market, advertise, promote, and sell the Licensed Product.

14.    **GOVERNING LAW:**

This Agreement shall be interpreted and construed under the laws of the State of Georgia, notwithstanding any conflict of law provisions to the contrary. The Federal or state courts situated in Fulton County, Georgia, United States of America, have exclusive jurisdiction over the resolution of all disputes that arise under this Agreement, and each party irrevocably submits to the personal jurisdiction of such courts. The United Nations Convention on Contracts for the International Sale of Goods shall not be applicable to the parties' rights or obligations under this Agreement.

15.    **ENTIRE UNDERSTANDING:**

This Agreement contains the entire and only understanding between the parties and supersedes all prior agreements between the parties respecting the subject matter hereof, and any representation, promise or condition in connection therewith not incorporated herein shall not be binding upon either party. Notwithstanding the foregoing, the parties agree that this Agreement shall not supersede or replace the Second Prior License Agreement, which shall continue in full force and effect for the balance of its term. Subject to Paragraphs 7 and 8 above, no modification, renewal, extension or amendment of this Agreement may be made unless in writing and signed by both Licensor and Licensee.

16.    **CONFIDENTIALITY:**

A.    The parties each acknowledge and agree that all information relating to the business and operations of either party learned by the other party during, or prior to, the term of this Agreement, is valuable and confidential property of the party whose information is learned. The parties acknowledge

-10-

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

the need for each of them to preserve the confidentiality and secrecy of such information, and agree that, both during the term and after any expiration or termination of this Agreement, they shall not, without the prior written consent of the disclosing party, use any such confidential information for its own benefit, or publish, disclose, communicate, reveal or divulge any such confidential information to, or use any such confidential information for the direct or indirect benefit of, any person, corporation or other entity other than the disclosing party, and will use the same degree of care to avoid publication or dissemination of any such confidential information as the receiving party employs with respect to his own information which he does not desire to have published or disseminated, but not less than a reasonable degree of care. Confidential information may be disseminated within the receiving party's own organization only to the extent reasonably necessary in connection with the performance of their duties for the receiving party.

B.      Notwithstanding the foregoing, information shall not be deemed to be confidential if it: (i) is now or hereafter becomes, through no act or omission on the part of the receiving party, generally known or available within the industry, or is now or later enters the public domain through no act or omission on the part of the receiving party, (ii) was acquired by the receiving party before receiving such information from the disclosing party and without restriction as to use or disclosure, (iii) is hereafter rightfully furnished to the receiving party by a third party, without restriction as to use or disclosure, (iv) is information which the receiving party can document was independently developed by the receiving party, (v) is disclosed with the prior written consent of the other party, or (vi) is required to be produced or disclosed by law, regulation or court order, provided the receiving party has given the disclosing party written notice of such obligation (to the extent practicable under the circumstances) such that the disclosing party has an opportunity to defend, limit or protect such production or disclosure.

17.   **FORCE MAJEURE:**

Neither party shall be liable for delays in the performance of its obligations under this Agreement to the extent such delays are due to: (i) causes beyond its reasonable control; (ii) acts of God, acts of civil or military authority, acts of terrorism, embargo, currency restrictions, fire, strikes, accidents, floods, epidemics, quarantine restrictions, war, riot, delays and/or non-availability of transportation; or (iii) an inability to obtain necessary labor, materials, components or manufacturing facilities through regular channels due to causes beyond its reasonable control.  Any delay occasioned thereby shall not be considered a breach of this Agreement.

18.   **CUMULATIVE REMEDIES:**

All rights and remedies conferred upon or reserved to the parties in this Agreement shall be cumulative and concurrent and shall be in addition to all other rights and remedies available to such parties at law or in equity or otherwise.  Such rights and remedies are not intended to be exclusive of any other rights or remedies and the exercise by any party of any right or remedy herein provided shall be without prejudice to the exercise of any other right or remedy by such party provided herein or available at law or in equity.

19.   **RELATIONSHIP:**

Neither party shall hold itself out to third parties as possessing any power or authority to enter into any contract or commitment on behalf of any other party.  This Agreement is not intended to, and shall not, create any agency, partnership or joint venture relationship between the parties.  Each party is an independent contractor with respect to the other.  Neither party is granted any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of, or in the name of the other party hereto, or to bind the other party hereto in any manner or with respect to anything, whatsoever.

-11-

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

20.    **NOTICE:**

All notices, requests, demands and other communications required or permitted to be made under this Agreement shall be in writing and shall be deemed duly given if hand delivered against a signed receipt therefor, sent by certified mail, return receipt requested, first class postage prepaid, or sent by nationally recognized overnight delivery service, in each case addressed to the party entitled to receive the same at the addresses set forth in the opening paragraph of this Agreement. Notices to Licensee shall include "Attn: Seth Richards, CEO," with a copy to "Legal Department." Either party may change the address to which communications are to be sent by giving notice of such change of address in conformity with this Paragraph. Notice shall be deemed to be effective, if personally delivered, when delivered; if mailed, at midnight on the third business day after being sent by certified mail; and if sent by nationally recognized overnight delivery service, on the next business day following delivery to such delivery service.

21.    **NON-COMPETITION:**

Licensee agrees that during the term of this Agreement, and for a period of one (1) year after the termination or expiration of this Agreement, Licensee shall not publish, market, distribute, sell or license, or otherwise exploit, competing products that use the Protected Rights or a toebox decreaser under the Forcefields name. Licensee agrees that, in the event of a breach by Licensee of this Section 21, in addition to and not in limitation of any other rights, remedies or damages available to Licensor at law or in equity, Licensor shall be entitled to emergency judicial relief, including without limitation, temporary restraining orders, preliminary injunctions and permanent injunctions in order to prevent or to restrain any such breach by Licensee, or parties acting or affiliated therewith. In any such action, Licensor shall, in addition to injunctive relief, be entitled to seek any monetary damages arising from Licensee's breach of this Agreement or other actionable misconduct.

22.    **COUNTERPARTS:**

This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

23.    **EXHIBITS AND SCHEDULES:**

All exhibits and schedules to this Agreement, if any, are hereby incorporated by reference into, and made a part of, this Agreement.

24.    **BINDING AGREEMENT:**

The parties hereby acknowledge that they have read the terms of this Agreement, that they have consulted with legal counsel concerning its terms and effect, and that they understand and voluntarily enter into this Agreement and intend to be legally bound by its terms.

25.    **ASSIGNMENT:**

Licensee may not assign any of its rights under this Agreement or delegate its performance under this Agreement, whether voluntarily or involuntarily, by merger, consolidation, dissolution, operation of law, or in any other manner, without the prior written consent of Licensor, provided, however, that Licensee may assign the Agreement in the event that a new financial sponsor (i.e., private equity firm or similar

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

investor) acquires all or substantially all of the assets, stock or membership interests of Licensee or if Licensee assigns the Agreement to an affiliate as part of a corporate reorganization. Any other merger, acquisition, or reorganization, including any judicial reorganization, or a sale of all or substantially all of Licensee's assets or all or substantially all of the assets of that portion of Licensee's business that manages this Agreement shall be considered an assignment under this Agreement and shall require Licensor's consent, which shall not be unreasonably withheld, conditioned, or delayed, and Licensee shall pay to Licensor a transfer fee of $100,000 in connection with such assignment. Except as permitted above, any other purported assignment of rights or delegation of performance in violation of this Section 25 is void.

26. **AUDIT RIGHTS:**
Upon reasonable notice, during the term of this Agreement and within two (2) years after the expiration or earlier termination of this Agreement, Licensor may audit Licensee's files relating to its sales, marketing and inventory of the Licensed Products. If the audit identifies an underpayment of more than five (5%) percent, then Licensor shall pay to Licensor the amount of the underpayment and the cost of the audit. Licensor may conduct any audit under this Section 26 at any time during regular business hours and no more frequently than once per year.

27. **WAIVER:**

The failure of a party to enforce any of the provisions of this Agreement, or to exercise any option provided in this Agreement, or to require performance by the other party of any of the provisions in this Agreement, is not a present or future waiver of such provisions and does not affect the validity of this Agreement or the right of the party to enforce each and every provision of this Agreement thereafter. The express waiver (whether one or more times) by a party of any provision, condition or requirement of this Agreement does not constitute a waiver of any future obligation of the other party to comply with such provision, condition or requirement.

28. **SAVINGS CLAUSE:**

If any provision of this Agreement is determined to be invalid, illegal or unenforceable, the remaining provisions of this Agreement remain in full force if the essential terms and conditions of this Agreement for each party remain valid, binding and enforceable. Wherever possible each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under any such law, such provision shall be limited to the minimum extent necessary to render the same valid or shall be excised from this Agreement, as the circumstances require, and this Agreement shall be construed as if said provision had been incorporated herein as so limited or as if said provision had not been included herein, as the case may be, and enforced to the maximum extent permitted by law, and the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated by this Agreement can be consummated as contemplated.

29. **SUCCESSORS AND ASSIGNS; NO THIRD PARTY BENEFICIARIES:**

This Agreement is legally binding upon and inures to the benefit of the parties and their permitted successors and assigns. No third party is intended to benefit from, nor may any third party seek to enforce, any of the terms of this Agreement.

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

IN WITNESS, the parties hereto have caused this Agreement to be executed as of the last day and year written below.

Licensee: IMPLUS FOOTCARE, LLC

By: _____

Print Name: _Seth Richards_

Title: _CEO_

Date: _25 Nov 2019_

Licensor: TELFAIR W. HOUSTON III, an individual
(d/b/a NUSOL INNOVATIONS)

By: _____

Print Name: _Telfair houston_

Title: _Ceo_

Date: _11 / 22 / 2019_

-14-

**EXHIBIT A**

**PROTECTED RIGHTS**

The invention described in United States Patent Application, Serial Number 13/066,833 (the "Patent Application"), filed on April 26, 2011, entitled "Insert for Footwear" (the "De-Creaser"), and the United States Patent No. 8,490,300 B1 that resulted therefrom, a copy of said patent which is attached hereto as Exhibit B, together with all other worldwide corresponding patent applications and registrations, including, but not limited to, any continuation, divisional, or continuation-in-part applications which claim priority from said Patent Application, all reissue and renewal patents thereof, and any other or future worldwide patent applications and letters patents that may have issued or that may subsequently issue based thereon, as well as Improvements made to said invention, and all intellectual property, proprietary information and confidential know-how pertaining to the innovative design and use of shoe inserts disclosed to Licensee by Licensor.

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

**EXHIBIT B**

**U.S. PATENT NO. 8,490,300 B1**

**(Attached)**

Doc ID: b51b1ff5dfecee6f166729d432894e6b04abc98b

**▼ HELLOSIGN**                                    Audit Trail

| | |
|---|---|
| **TITLE** | License Agreement |
| **FILE NAME** | Nusol License Agr...mber 22 2019).pdf |
| **DOCUMENT ID** | b51b1ff5dfecee6f166729d432894e6b04abc98b |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT**
**11 / 22 / 2019**
17:48:07 UTC
Sent for signature to Telfair Houston (houstontelfair@gmail.com) from nbell@360vlaw.com
IP: 128.177.22.130

**VIEWED**
**11 / 22 / 2019**
22:42:03 UTC
Viewed by Telfair Houston (houstontelfair@gmail.com)
IP: 73.43.90.61

**SIGNED**
**11 / 22 / 2019**
22:42:58 UTC
Signed by Telfair Houston (houstontelfair@gmail.com)
IP: 73.43.90.61

**COMPLETED**
**11 / 22 / 2019**
22:42:58 UTC
The document has been completed.

Powered by **▼ HELLOSIGN**



US008490300B1

(12) **United States Patent**
Houston, III

(10) **Patent No.:**     **US 8,490,300 B1**
(45) **Date of Patent:**     **Jul. 23, 2013**

(54)  **INSERT FOR FOOTWEAR**

(76)  Inventor:  **Telfair W. Houston, III**, Atlanta, GA (US)

( * )  Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 191 days.

(21)  Appl. No.: **13/066,833**

(22)  Filed:  **Apr. 26, 2011**

**Related U.S. Application Data**

(63)  Continuation-in-part of application No. 12/653,627, filed on Dec. 16, 2009, now abandoned.

(51)  Int. Cl.
 *A43B 23/08*     (2006.01)
 *A43B 13/22*     (2006.01)
(52)  U.S. Cl.
 USPC ........................................... **36/77 R**; 36/72 R
(58)  Field of Classification Search
 USPC ..................... 36/54, 72 R, 77 R, 71, 113, 114, 36/93, 96
 See application file for complete search history.

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,175,292 | A | * 3/1965 | MacQuaid et al. ........... 36/72 R |
| 3,481,055 | A | * 12/1969 | Pinky ........................... 36/72 R |
| 3,841,004 | A | * 10/1974 | Gray et al. ................... 36/72 R |
| 4,069,599 | A | * 1/1978 | Alegria ........................... 36/7.2 |
| 4,237,628 | A | * 12/1980 | Etancelin ....................... 36/131 |
| 4,648,923 | A | 3/1987 | Chapnick |
| 4,769,926 | A | 9/1988 | Meyers |
| 4,782,605 | A | 11/1988 | Chapnick |
| 4,887,369 | A | 12/1989 | Bailey |
| 5,457,898 | A | * 10/1995 | Fortin et al. ................... 36/72 R |
| 5,947,918 | A | 9/1999 | Jones |
| 6,161,313 | A | * 12/2000 | Bisson ........................... 36/72 R |
| 6,170,174 | B1 | * 1/2001 | Gesso ........................... 36/72 R |
| 6,397,848 | B1 | 6/2002 | Kagekata |
| 6,584,978 | B1 | 7/2003 | Brett |
| 6,598,323 | B1 | * 7/2003 | Gougelet et al. ............. 36/77 R |
| 7,373,741 | B1 | * 5/2008 | Brown ........................... 36/110 |
| 2001/0022039 | A1 | * 9/2001 | Krajcir ........................... 36/72 R |
| 2002/0104174 | A1 | 8/2002 | Bartlett |
| 2002/0184794 | A1 | 12/2002 | Peterson |

FOREIGN PATENT DOCUMENTS

WO     WO2004037029     5/2004

* cited by examiner

*Primary Examiner* — Jila M Mohandesi

(74) *Attorney, Agent, or Firm* — J.T. Hollin, Jr. Attorney at Law

(57)  **ABSTRACT**

Disclosed is a readily removable molded insert for footwear, including dress or casual shoes and sneakers. The insert may be manufactured from a variety of resiliently compressible, semi-rigid, and/or resiliently deformable materials and is designed for the purpose of maintaining the general shape and appearance of the upper section of a shoe. Embodiments of the insert are specifically designed to adapt to and conform to the shape of footwear and also to adapt to the contour of a user's foot while the footwear is being worn. The insert may be further cut, trimmed, or separated to fit a range of shoe sizes, by use of perforations along the outer rim of certain embodiments of the insert. Another embodiment of the insert may remain adhesively attached to the inside of the shoe, or it may be removed and repositioned within the shoe, as necessary.

**22 Claims, 5 Drawing Sheets**

